**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISON**

| | | |
|---|---|---|
| BMB DINING SERVICES (FUQUA), INC. d/b/a BOMBSHELLS HOUSTON-SOUTH, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| THE TEXAS ALCOHOLIC BEVERAGE COMMISSION; A. BENTLEY NETTLES, in his official capacity as Executive Director of the Texas Alcoholic Beverage Commission; and GOVERNOR GREG ABBOTT, in his official capacity, | § § § § § § § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT &
APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff BMB Dining Services (Fuqua), Inc. d/b/a Bombshells Houston-South ("Bombshells") files this Original Complaint and Application for Preliminary and Permanent Injunctive Relief against Defendants, Texas Alcoholic Beverage Commission, A. Bentley Nettles, in his official capacity as Executive Director of the Texas Alcoholic Beverage Commission, and Governor Greg Abbott, in his official capacity as Governor of the State of Texas.

**SUMMARY**

1.     This is an action principally for declaratory judgment and injunctive relief brought pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment's guarantees of due process and equal protection and the equivalent protections afforded under the Texas Constitution. In addition, or in the alternative to the foregoing, Plaintiff brings this action pursuant to the Fifth

1

Amendment's and Texas Constitution's requirement that the government must provide compensation for regulatory takings.

2.     Governor Greg Abbott's Executive Order GA-28 is the latest in a series of evolving COVID-19 order issued by executive fiat. With the increase in COVID-19 positivity rates and hospitalizations in recent weeks, Governor Abbott declared in GA-28 that "targeted and temporary adjustments to the reopening plan are needed to achieve the least restrictive means for reducing the growing spread" of the virus. The "targeted" adjustment at issue was the classification of "bars and similar establishments"—and only those commercial establishments—as enterprises that "people shall not visit."

3.     Under the current regime, the Texas Alcoholic Beverage Commission ("TABC") issued an "Emergency Order of Suspension" to Bombshells on July 12, 2020. The TABC's order not only suspended Bombshells' liquor permit, the TABC takes the position that Bombshells may not operate at all.

4.     The Fourteenth Amendment's Equal Protection Clause requires that all governmental classifications be rationally related to the legitimate governmental purpose at hand. GA-28's "targeted" approach means that "restaurants" who offer dine-in services and sell alcohol are allowed to continue operating with reduced occupancy limits. However, a "bar" that offers dine-in services, sells alcohol, and holds a liquor permit is not allowed to be open at all according to the TABC. A classification system that draws a lockdown line around establishments solely because they sell alcohol and hold a liquor permit is not rationally related to the purpose of mitigating the spread of this disease.

5.     GA-28, on its face, violates the procedural aspects of the Fourteenth Amendment's Due Process Clause. The executive order is the latest in a succession of sphinxlike orders that leave

the specified enforcement mechanism largely to the imagination. Indeed, as-applied to Plaintiff, the TABC's enforcement of GA-28 through issuance of an "emergency" suspension order has deprived Bombshells of its protected property interest in operating its business without affording it adequate pre- or post-deprivation process.

6.      In addition to the foregoing, GA-28's preference for taking a "targeted" approach designed to "achieve the least restrictive means for reducing" the spread of the virus is another way of saying that some selected businesses must be forced to bear a public burden which, in all fairness and justice, should be borne by the public as a whole. The Fifth Amendment requires compensation for a regulatory taking.

## PARTIES

7.      Plaintiff BMB Dining Services (Fuqua), Inc. d/b/a Bombshells Houston-South is a Texas corporation doing business at 12810 Gulf Freeway, Suite A, Houston, Texas 77034.

8.      Defendant Governor Greg Abbott is the Governor of the State of Texas and is sued in his official capacity. Governor Abbott may be served by delivering service to Ken Paxton, Attorney General for the State of Texas, with copy to Darren McCarty, Deputy Attorney General for Civil Litigation, Price Daniels, Sr. Building, 209 West 14th Street, 8th Floor, Austin, Texas 78701.

9.      Defendant Texas Alcoholic Beverage Commission ("TABC") is the state agency authorized to administer and enforce the Texas Alcoholic Beverage Code and administrative rules adopted to implement the Code. Defendant A. Bentley Nettles is the TABC's Executive Director, and is sued in his official capacity.

10.     The TABC and its Executive Director may be served by delivering service to the Executive Director at the TABC's headquarters, 5806 Mesa Drive, Austin, Texas 78731.

**JURISDICTION AND VENUE**

11.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has original jurisdiction over all civil matters arising under the Constitution and laws of the United States, and to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity that the Constitution secures to the people. This Court further has supplemental jurisdiction of Plaintiff's related claims under state law. 28 U.S.C. § 1367.

12.     Plaintiff's claims for declaratory and injunctive relief are authorized under 28 U.S.C. § 2201, Rules 57 and 65 of the Federal Rules of Civil Procedure.

13.     Venue of this case lies in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because Plaintiff conducts business in Harris County, Texas and because the TABC enforced the Governor's executive order against Plaintiff in Harris County. The issues in this case are not unique or particular to any one locality. The Governor's executive orders apply equally across the State of Texas. The resolution of this case will have state-wide significance.

**FACTS**

**I.     COVID-19**

14.     COVID-19 is a monumental public health crisis. As of the filing of this complaint, there have been approximately 365,000 reported cases of COVID-19 in the State of Texas, with 3,300 deaths. Thousands of positive cases are now being reported on a daily basis.

15.     Though much remains to be discovered about COVID-19's pathogenesis, its primary mode of transmission is the inhalation or ingestion of virus-laden respiratory droplets discharged into the air and onto surfaces when an infected person coughs, sneezes, or talks.[1] The

---

[1] Centers for Disease Control and Prevention ("CDC"), *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (*last accessed* July 15, 2020).

growing scientific consensus is that COVID-19 is in fact an airborne virus[2] capable of being spread by both asymptomatic and symptomatic individuals.[3] The virus may spread wherever people congregate, regardless of their purpose in gathering, whether it be a family gathering setting or to attend religious services.[4]

## II.   THE GOVERNOR'S EXECUTIVE ORDERS

16.     On March 13, 2020, Governor Abbott issued a proclamation that "COVID-19 poses an imminent threat of disaster, and declar[ed] a state of disaster for all counties in Texas."[5] Pursuant to his authority under state law to "issue executive orders," which "have the force and effect of law," TEX. GOV'T CODE § 418.012, Governor Abbott issued Executive Order GA-08— the first broadly applicable executive order—on March 19, 2020.[6]

17.     GA-08 provided that Texans were not "prohibit[ed] from visiting a variety of places" such as grocery stores and banks, nor were they required to shelter-in-place. Certain kinds of businesses were classified as those that "people shall avoid," including bars and restaurants:

---

[2] *See* Lidia Morawska, *et al.*, *It is Time to Address Airborne Transmission of COVID-19*, CLINICAL INFECTIOUS DISEASES, ciaa939, July 6, 2020, https://doi.org/10.1093/cid/ciaa939 (*last accessed* July 15, 2020).

[3] *See* Furukawa NW, et al., *Evidence supporting transmission of severe acute respiratory syndrome coronavirus while presymptomatic or asymptomatic*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://doi.org/10.3201/eid2607.201595 (*last accessed* July 15, 2020).

[4] Will Feuer, *CDC tracks cluster of coronavirus cases in rural Arkansas to church, raising alarm on religious gatherings*, CNBC, May 19, 2020, https://www.cnbc.com/2020/05/19/cdc-tracks-cluster-of-coronavirus-cases-in-rural-arkansas-to-church-raising-alarm-on-religious-gatherings.html (*last accessed* July 15, 2020); Washetenaw County, Michigan, *Washtenaw County Health Department Identifies Multiple COVID-19 Cases Related to Large Party*, https://www.washtenaw.org/CivicAlerts.aspx?AID=1040 (*last accessed* July 15, 2020).

[5] Governor Greg Abbott, *Proclamation by the Governor of the State of Texas* (Mar. 13, 2020), https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf, (*last accessed* July 15, 2020).

[6] Texas Executive Order No. GA-08 (Mar. 19, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_08_COVID-19_preparedness_and_mitigation_FINAL_03-19-2020_1.pdf, (*last accessed* July 15, 2020).

> Order No. 2   In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, or visiting gyms or massage parlors; provided, however, that the use of drive-thru, pickup, or delivery options is allowed and highly encouraged throughout the limited duration of this executive order.

18.     On March 31, 2020, the Governor issued GA-14.[7] The decree provided that, effective April 2, 2020, "every person in Texas shall … minimize social gatherings and minimize in-person contact with people who are not in the same household" except where necessary to provide or obtain "Essential Services," a new classification of businesses.

19.     GA-18 also expanded the existing roster of businesses that "people shall avoid." Bars and restaurants remained in the mix:

> In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, or visiting gyms, massage establishments, tattoo studios, piercing studios, or cosmetology salons; provided, however, that the use of drive-thru, pickup, or delivery options for food and drinks is allowed and highly encouraged throughout the limited duration of this executive order.

20.     On April 27, 2020, Governor Abbott issued GA-18 relating to the expanded reopening of services as part of the plan to reopen Texas.[8] The order provided that effective May 1, 2020, a new classification of businesses—"Reopened Services"—would be allowed to operate even if they were not "Essential Services." "Reopened Services" included the following:

---

[7] Texas Executive Order No. GA-14 (Mar. 31, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE_03-31-2020.pdf, (*last accessed* July 15, 2020).

[8] Texas Executive Order No. GA-18 (Apr. 27, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-18_expanded_reopening_of_services_COVID-19.pdf, (*last accessed* July 15, 2020).

> b) Dine-in restaurant services, for restaurants that operate at up to 25 percent of the total listed occupancy of the restaurant; provided, however, that (a) this applies only to restaurants that have less than 51 percent of their gross receipts from the sale of alcoholic beverages and are therefore not required to post the 51 percent sign required by Texas law as determined by the Texas Alcoholic Beverage Commission, and (b) valet services are prohibited except for vehicles with placards or plates for disabled parking.

21.     The "51 percent sign" refers to Tex. Alco. Bev. Code § 104.06(c) and Tex. Gov't Code § 411.204. In short, a business that holds a TABC liquor permit and derives 51 percent or more of its income from the sale of alcoholic beverages for on-premises consumption must display a "Red Sign." Those that derive 50 percent or less of their income from the sale of alcoholic beverages must post a "Blue Sign."

22.     Unlike restaurants, bars with a majority of their revenue generated from the sale of alcohol were not a "Reopened Service," so they remained classified as establishments that "people shall avoid visiting:"

> People shall avoid visiting bars, gyms, public swimming pools, interactive amusement venues such as bowling alleys and video arcades, massage establishments, tattoo studios, piercing studios, or cosmetology salons.  The use of drive-thru, pickup, or delivery options for food and drinks remains allowed and highly encouraged throughout the limited duration of this executive order.

23.     May 18, 2020 saw the issuance of GA-23.[9] In addition to continuing the elimination of confinement as an available penalty with "regulatory enforcement," GA-23 converted the "Essential Services" classification into "Covered Services."

---

[9] Texas Executive Order No. GA-23 (May 18, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-23_phase_two_expanding_opening_COVID-19.pdf, (*last accessed* July 15, 2020).

24.     Thus, effective May 22, 2020, "Covered Services"—including bars and restaurants—could resume business subject to occupancy limitations:

> a. Dine-in restaurant services, for restaurants that operate at up to 50 percent of the total listed occupancy of the restaurant; provided, however that (i) this applies only to restaurants that have less than 51 percent of their gross receipts from the sale of alcoholic beverages; and (ii) any components of the restaurants that have interactive functions or exhibits, including child play areas, interactive games, and video arcades, must remain closed.
>
> b. Bars and similar establishments that are not restaurants as defined above, that hold a permit from the Texas Alcoholic Beverage Commission, and that are not otherwise expressly prohibited in this executive order, for such establishments that operate at up to 25 percent of the total listed occupancy of the establishment; provided, however, that any components of the establishments that have interactive functions or exhibits, including child play areas, interactive games, and video arcades, must remain closed.

25.     On June 3, 2020, issuance of GA-26 continued the 'reopening' of Texas.[10] The order abandoned the "Covered Services" classification altogether, instead presenting a generally applicable occupancy rule that "[e]very business establishment in Texas shall operate at no more than 50 percent of the total listed occupancy of the establishment." The general rule was subject to multiple exceptions keyed to specified industries and business-functions:

> 6. For dine-in services by restaurants that have less than 51 percent of their gross receipts from the sale of alcoholic beverages, the occupancy limit shall increase at 12:01 a.m. on June 12, 2020, to permit such restaurants to operate at up to 75 percent of the total listed occupancy of the restaurant;
>
> 7. For indoor bars and similar indoor establishments that are not restaurants as defined above and that hold a permit from the Texas Alcoholic Beverage Commission, only those customers who are seated may be served;

---

[10] Texas Executive Order No. GA-26 (June 3, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-26_expanded_opening_COVID-19.pdf, (*last accessed* July 15, 2020).

26.     Coronavirus cases began to surge in and around the time of GA-26's issuance. During a news conference in mid-June, Governor Abbott explained that "There are certain counties where a majority of the people who are tested positive in that county are under the age of 30, and this typically results from people going to bars."[11] Of course, "[Governor] Abbott said that it's unclear why more young people are contracting the virus, but he speculated that it could be from increased activity over Memorial Day weekend, visits to bars or other types of social gatherings."

27.     Against this backdrop, Governor Abbott issued Executive Order GA-28 on June 26, 2020, which remains in effect and has no explicit ending date.[12] The order maintains the generally applicable 50 percent occupancy limitation, reduces the occupancy exception for "dine-in services by restaurants," while ensconcing "bars or similar establishments" within the "people shall not visit" classification:

> 6.  For dine-in services by restaurants that have less than 51 percent of their gross receipts from the sale of alcoholic beverages, the occupancy limit shall remain at 75 percent until 12:01 a.m. on June 29, 2020, at which time such restaurants may only operate at up to 50 percent of the total listed occupancy of the restaurant, subject to paragraph number 9 below;
>
> 7.  People shall not visit bars or similar establishments that hold a permit from the Texas Alcoholic Beverage Commission (TABC) and are not restaurants as defined above in paragraph number 6; provided, however, that the use by such bars or similar establishments of drive-thru, pickup, or delivery options for food and drinks is allowed to the extent authorized by TABC;

---

[11] Sarah Champagne, *Surge in coronavirus cases linked to more Texans in their 20s getting sick, officials say*, TEXAS TRIBUNE, June 16, 2020, https://www.texastribune.org/2020/06/16/texas-coronavirus-spike-young-adults/ (*last accessed* July 15, 2020).

[12] Texas Executive Order No. GA-28 (June 26, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-28_targeted_response_to_reopening_COVID-19.pdf, (*last accessed* July 15, 2020). A courtesy copy of GA-28 is attached hereto as **Exhibit A**.

28.     GA-28 provides that "failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable under Section 418.173 by a fine not to exceed $1,000 and may be subject to regulatory enforcement."

29.     According to a press release issued that same day, the Governor explained that "[t]he targeted, measured directives in the executive order are based on links between certain types of businesses and services and the recent rise in positive cases throughout the state…. At this time, it is clear that the rise in cases is largely driven by certain types of activities, including Texans congregating in bars."[13] The factual basis for the "links between certain types of businesses" and the increase of cases does not appear to have been revealed.

## III.    PLAINTIFF'S OPERATIONS & TABC'S ENFORCEMENT OF GA-28

30.     Bombshells is military-themed restaurant. It offers an extensive menu of food ranging from "MacArthur's Supreme Commander Nachos" to "Bombshells Spicy Cajun Shrimp." Because it also serves beer and mixed drinks alongside food, Bombshells holds a TABC liquor permit.

31.     Bombshells was closed in the wake of GA-18, reopened with reduced occupancy limits under GA-23, and limited its service of alcohol to only those customers who were seated under GA-26.

32.     On July 12, 2020, two TABC officers arrived at Bombshells to deliver an Emergency Order of Suspension ("Suspension Order") executed by A. Bentley Nettles, the Executive Director of the TABC.

---

[13] Press Release, Office of the Texas Governor, *Governor Abbott Takes Executive Action To Contain Spread Of COVID-19*, June 26, 2020, https://gov.texas.gov/news/post/governor-abbott-takes-executive-action-to-contain-spread-of-covid-19, (*last accessed* July 15, 2020).

33.     The Suspension Order alleges the following:

> On or about July 10, 2020, [Bombshells] failed to operate its business in accordance with GA-28 by allowing people to visit its premises. [Bombshells] derives 51% or more of its gross receipts from the sale of alcoholic beverages and qualifies as a bar. Therefore, [Bombshells] was prohibited from allowing people to visit its premises after 12:00PM on June 26, 2020.
>
> In light of the foregoing, [Mr. Nettles] determined that the continued operation of [Bombshells] business would constitute a continuing threat to the public welfare.
>
> **IT IS THEREFORE ORDERED**, pursuant to Alcoholic Beverage Code § 11.614, that [Bombshells'] Permits are **suspended for thirty (30) days** effective immediately.[14]

34.     Justification for the Suspension Order was premised on Bombshells' having reported in its April 2020 renewal application that 69 percent of its gross receipts was from the sale of alcoholic beverages. However, on July 12, 2020, Bombshells' gross receipts from the sale of alcohol was below 50 percent.

35.     As a result of the Suspension Order, the TABC informed Bombshells, through counsel, that not only is the business's liquor permit suspended, the business as a whole must remain closed.

## CAUSES OF ACTION

36.     42 U.S.C. § 1983 provides that a person who, acting under color of law, subjects or causes any citizen to be subjected to the deprivation of any rights, privileges, or immunities secured by the United States Constitution, shall be liable to the party injured in an action at law.

37.     At all relevant times and regarding all relevant actions of the individual Defendants as alleged in this Complaint, Defendants were acting in their official capacities. Defendants, acting

---

[14] **Exhibit B**, Emergency Order of Suspension dated July 12, 2020 (emphasis original).

under color of law, have subjected and caused Plaintiff to be subjected to the deprivation of its rights, privileges, or immunities as secured by the Fifth and Fourteenth Amendments.

38.     In addition to the foregoing, Plaintiff brings its claims pursuant to the Texas Constitution, Article I, §§ 3, 17, and 19.

## COUNT I
### (Fourteenth Amendment and Tex. Const. Art. I, § 3—Equal Protection Clause)

39.     Plaintiff challenges GA-28's classification of bars as establishments that "people shall not visit" as violative of the Equal Protection Clause of the Fourteenth Amendment.

40.     The Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. This guarantee "is both simple and wide—equal and uniform governmental classifications" are required. *Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1056 (5th Cir. 1984).

41.     The Texas Constitution provides the equivalent guarantee that "[a]ll free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX. CONST. ART. I, § 3.  The "federal analytical approach applies to equal protection challenges under the Texas Constitution." *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex.2002).

**A.  Bars and restaurants are similarly situated.**

42.     With respect to GA-28's provisions and restrictions, bars are similarly situated to restaurants in all relevant respects. Restaurants sell food and may also serve alcohol. Bars sell alcohol and may also serve food. Both types of establishments employ people to make consumables and serve them to customers. Bars and restaurants permit their patrons to dine, drink, and loiter within their business premises.

43.     Status as a bar or restaurant does not inherently dictate the size or demographics of groups that congregate or their proximity to each other. A popular restaurant that serves no alcohol whatsoever may see throngs of people congregate to enjoy a meal, whereas a 'dive-bar' may see few customers each day, and vice-versa.

44.     For present purposes, the only difference between bars and restaurants is GA-28's arbitrary definitional dividing line. An establishment that has "dine-in services" is a restaurant if it makes less than 50 percent of its gross sales from alcoholic beverage. An establishment that has "dine-in services" becomes a "bar" that "people shall not visit" if it crosses the 51 percent alcohol sales threshold and holds a permit from TABC.

45.     This distinction has caused Bombshells to be treated differently from similarly situated establishments such as well-known chains like Applebee's, Chili's Grill & Bar, and Olive Garden, all of which serve alcohol alongside food to people who patronize their businesses.

**B.  GA-28's classification does not pass muster under rational basis review.**

46.     "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

47.     It has long been recognized that "[t]he purpose of quarantine and health laws and regulations with respect to contagious and infectious diseases is directed primarily to preventing the spread of such diseases among the inhabitants of localities." *Jew Ho v. Williamson*, 103 F. 10, 21–22 (C.C.N.D. Cal. 1900). Containment of a pathogen transmitted among groups of symptomatic and asymptomatic individuals in close proximity to each other through an airborne vector is unquestionably a legitimate government purpose.

48.     Thus, GA-28's generally applicable occupancy limit is rationally related to the purpose of disease containment. So too is its requirement that "people shall not visit nursing

homes" where elderly and susceptible individuals live. Likewise, GA-29's requirement that individuals don facemasks when out in public is rationally related to the purpose of mitigating the dispersion of virus-laden respiratory droplets and aerosols.[15] All of these examples bear a relationship to the objective to be advanced in light of the virus's nature.

49.     The distinction between bars and restaurants in this circumstance does not flow logically from the intended purpose of GA-28—disease containment. Drawing disease containment lines between establishments that "people shall not visit" because they have made 51 percent of their sales from alcohol (at some point in the past) and hold TABC liquor permits for lockdown—while simultaneously allowing establishments that makes less than 50 percent of their money from such sales to remain open—is not rationally related to that objective. This is evidenced in the fact that even if GA-28 authorized the TABC to temporarily (or permanently) suspend a bar's liquor permit, that bar could hypothetically continue to operate as a restaurant that the dining-public may continue visiting.

50.     The notion that GA-28's classification of bars as establishments that "people shall not visit" is merely a "targeted and temporary adjustment[]" intended to apply the "restrictive means for reducing the growing spread of COVID-19 … to avoid a need for more extreme measures" does not provide the logical bridge for implementation of the differential classification. If the "targeted" lockdown of bars was predicated on reducing the number of establishments where people congregate and spread disease, one would imagine that restaurants, churches, youth camps, museums, cosmetology salons, amusement parks, and meatpacking plants should also be "targeted" for lockdown.

---

[15] Texas Executive Order No. GA-29 (relating to face coverings) (July 2, 2020), https://open.texas.gov/uploads/files/organization/opentexas/EO-GA-29-use-of-face-coverings-during-COVID-19-IMAGE-07-02-2020.pdf, (*last accessed* July 15, 2020).

51.     They are not so ordered because GA-28's classification of bars as establishments that "people shall not visit" is not rationally to the objective of disease containment. At best, its only objective is to place a differential burden on bars based on a speculative assumption that the rise in positive cases of COVID-19 is tied to bars. *See U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (finding that classifying households containing one or more unrelated persons as ineligible for food stamps was not rationally related to the purpose of the program).

52.     In sum, the classification's relationship to the laudable goal of stalling the spread of the virus is so attenuated as to render the distinction arbitrary and irrational. The Governor's decrees need not be perfect, but they must at least have some reasonable basis to comport with the Constitution's requirement of equal protection, even in a time of pandemic.

**COUNT II**
**(Fourteenth Amendment and Tex. Const. Art. I, § 19—Due Process Clause)**

53.     The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. The Texas Constitution provides the equivalent guarantee that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. ART. I, § 19. "[T]he protection afforded under the procedural due process rights granted by article I, section 19, are congruent with those in the Federal Constitution." *Price v. City of Junction, Tex.*, 711 F.2d 582, 590 (5th Cir. 1983).

54.     Due process is a flexible inquiry that, at a minimum, requires notice and the opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). The Constitution requires notice and "some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). "If … the state is

able to provide the affected individual with a hearing before the deprivation occurs, due process usually requires that the state do so." *Augustine v. Doe*, 740 F.2d 322, 327–28 (5th Cir. 1984).

55.     Procedural due process is primarily meant to protect persons from the mistaken or unjustified deprivation of life, liberty, or property. This includes the right to have and use the property and the benefits from it, as well as the "liberty to operate a legitimate business, free from arbitrary deprivation by local police acting under the color of state law." *San Jacinto Savings and Loan v. Kacal*, 928 F. 2 d 697, 702 (5th Cir.1991). To establish a violation procedural due process, a plaintiff must prove that "(1) he was deprived of a life, liberty, or property interest (2) without the process that was due." *Saucedo-Falls v. Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. 2008).

56.     Plaintiff has protected property and liberty interests in operating a lawful business. The Fifth Circuit has recognized these as "important rights" that due process protects. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 221 (5th Cir. 2012); *see, e.g.*, *Kacal*, 928 F.2d at 704 ("Kacal's property interest in the profits of her business and her liberty interest in operating her business do rise to the level of protectible interests"); *Shelton v. City of Coll. Station*, 754 F.2d 1251, 1256 (5th Cir. 1985), on reh'g, 780 F.2d 475 (5th Cir. 1986) ("Texas law recognizes that the right of the owner of a property interest to use his property for a lawful purpose cannot be arbitrarily and discriminatorily restricted by governmental zoning action"). Likewise, Plaintiff's permit to sell alcohol is also subject to "relevant constitutional restraints [that] limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'" *Bell v. Burson*, 402 U.S. 535, 539 (1971).

57.     These interests are significant. The loss of the ability to reopen for business in any capacity imperils Plaintiff's very right to exist. Defendants deprived Plaintiff of these rights under color of law and without due process of law.

**A.  GA-28 violates procedural due process.**

58.     On its face and as-applied to Plaintiff, GA-28 denies bars procedural due process. Procedural due process attaches because GA-28 is in the nature of an administrative or adjudicative act, not that of a legislative body. See *Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1074 (5th Cir. 1989). Moreover, in countenancing "regulatory enforcement," GA-28 envisions some kind of an administrative proceeding.

59.     However, GA-28 is constitutionally deficient because it provides absolutely no procedures or direction for what "regulatory enforcement" actions may be taken for failure to comply with its terms. GA-28—as with all of its predecessors—lack provisions for notice and an opportunity to be heard prior to "regulatory enforcement," which are the fundamental requisites of due process. The executive order provides no limitations on the "regulatory" means, methods, or processes that may be used to enforce its terms, let alone what property interests or privileges may be deprived for alleged violation of its terms.

**B.  The Suspension Order denies procedural due process.**

60.     The Suspension Order denied Plaintiff adequate pre- and post-deprivation process. "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon,* 494 U.S. at 126.

61.     In deciding whether the procedural due process provided was adequate, three considerations are weighed: "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest,

17

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

62.     The Suspension Order provides no adequate pre-deprivation notice or opportunity to be heard. The TABC points to section 11.614 of the Texas Alcoholic Beverage Code, which provides that "[i]f the commission or administrator determines that the continued operation of a permitted or licensed business would constitute a continuing threat to the public welfare, the commission or administrator may issue an emergency order, without a hearing, suspending the permit or license for not more than 90 days." TEX. ALCO. BEV. CODE § 11.614(a).

63.     A pre-deprivation hearing was entirely practicable. The TABC cannot claim that the deprivation in this matter was entirely unforeseeable, random, or unpredictable at a given point in time. *See Zinermon,* 494 U.S. at 136. The justification that Plaintiff presents a "continuing threat to public welfare"—an entirely vague descriptor that compounds the constitutional defect[16]—does not justify the immediate suspension of Plaintiff's permit or ability to continue operating.

64.     Absent some kind of imminent harm to the public, due process requires a state to provide a hearing *before* depriving a person of their property. This is not one of those rare and extraordinary situations in which the government may take summary action without notice or an opportunity to be heard, *e.g*., if an establishment was known to be selling contaminated food, or perhaps affirmatively inviting individuals known to be infected with the virus to have a party.

65.     The risk of erroneous deprivation of Plaintiff's protected and important interests is high. The TABC, even if "proceeding in utmost good faith … act[s] on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed.

---

[16] This language is similar to the language in the Medical Licensing Act, which provides that to temporarily suspend a medical license, a disciplinary panel must determine that the doctor's continued practice constitutes a "continuing threat to the public welfare." TEX. OCC. CODE § 164.059(b).

The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." *Goss v. Lopez*, 419 U.S. 565, 580 (1975).

66.     The post-deprivation relief under the Suspension Order is likewise inadequate. The authority under which the TABC purported to act—the Governor's executive order—provides no post-deprivation procedure or remedy for the unlawful enforcement of its dictates. *See Martin v. Dallas County, Tex.*, 822 F.2d 553, 555 (5th Cir. 1987). Consequently, the TABC relies on Section 11.614, which provides that "[i]f an emergency order is issued without a hearing under this section, the commission or administrator shall set the time and place for a hearing to be conducted not later than the 10th day after the date the order was issued." TEX. ALCO. BEV. CODE § 11.614(c).

67.     However, the TABC has denied Plaintiff due process by ignoring this provision, preferring instead to consider the matter "a contested case under Chapter 2001, Government Code." *Id.* at § 11.614(e). The state's due process requirements for licenses, set forth at Texas Government Code § 2001.054, is incongruent with application section 11.614 because it provides "for hearing after reasonable notice of not less than 10 days." TEX. GOV'T CODE § 2001.054(a).

### COUNT III
### (Fifth Amendment and Tex. Const. Art. I, § 17—Takings Clause)

68.     In addition, or in the alternative to the foregoing, Plaintiff brings a claim against the TABC pursuant to the Takings Clause of the Fifth Amendment as applied to the states through the Fourteenth Amendment and the Texas Constitution.

69.     The Fifth Amendment provides that "nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V. The Texas Constitution provides the equivalent guarantee that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made…." TEX. CONST. ART. I, § 17.

"[I]n applying the Texas constitutional provision … [state courts] look to federal jurisprudence for guidance." *Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004).

70.     Under the Supreme Court's "modern takings law, there is 'no magic formula' to determine 'whether a given government interference with property is a taking.'" *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2187 (2019) (citation omitted). Takings claims involve several fundamental concepts.

71.     First, the validity of the law or decree that effects the taking is not the focal point. Rather, the point is "to secure compensation in the event of otherwise proper interference…." *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 539 (2005). Second, there must be a balance between "the individual's right to retain the interests and exercise the freedoms at the core of private property ownership" and the "government's well-established power to adjust rights for the public good." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (cleaned-up). Third, "[i]n all instances, the analysis must be driven 'by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.,* quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

72.     As-applied to Plaintiff, the TABC's decision to enforce GA-28 via the Suspension Order constitutes a regulatory taking that "goes too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). In contrast to GA-28, which provides that failure to comply is subject to a fine not to exceed $1,000 "and may be subject to regulatory enforcement," the Suspension Order goes further, depriving Plaintiff of not only its TABC permit, but the use of its property for useful commercial purposes altogether. The Suspension Order has therefore rendered Plaintiff's property

economically idle. *First Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987); *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1019 (1992).

73.     That the Suspension Order might permit a hearing at some point in the future is irrelevant. "The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Knick,* 139 S. Ct. at 2170.

74.     The economic impact of the Suspension Order on Plaintiff's possessory interest in the property and ability to use it for economically beneficial purposes is severe. *Murr*, 137 S. Ct. at 1943. Not only has the Suspension Order eliminated Plaintiff's ability to generate revenue from the sale of food and beverages on its property, it has caused Plaintiff to lose the value of its food and beverage stock, which now lays dormant and unused.

75.     The Suspension Order has interfered with Plaintiff's distinct investment-based expectations. Quite obviously, Plaintiff bought the property in reliance on a pre-pandemic state of affairs that did not include the possibility of being locked-down to contain the spread of disease.

76.     With respect to the character of the governmental action, as discussed above, bars have been hand-picked for closure merely because they sell alcohol and have a permit, and GA-28 does not reveal how long this selective lockdown will last. Even if another executive order is issued that ultimately relieves bars of their status as businesses that "people shall not visit," it is impossible to divine with any degree of certainty when the pandemic will abate or if bars will find themselves excluded from economic life all over again. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 342 (2002).

77.     Accordingly, Plaintiff requests, at a minimum, damages in the form of just compensation for the value of the property's use for the duration of the lockdown imposed by and through GA-28 and the Suspension Order.

**COUNT IV**
**(<u>Declaratory Relief</u>)**

78.     Pursuant to Section 1983 and 28 U.S.C. § 2201, Plaintiff asks for the following declarations:

> (a) GA-28's classification of bars as businesses that "people shall not visit" violates equal protection;
>
> (b) GA-28's lack of procedural safeguards for "regulatory enforcement" violates due process;
>
> (c) GA-28 does not authorize or permit "regulatory enforcement" of its terms via emergency suspension orders issued without pre- or post-deprivation process; and
>
> (d) GA-28 does not authorize or permit the TABC to go beyond permit revocation by closing Plaintiff's business or impeding the otherwise lawful business without due process.

## <u>APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

79.     Pursuant to Federal Rule of Civil Procedure 65, Plaintiff asks the Court to issue preliminary and permanent injunctions enjoining the TABC from the following—

> (a) Enforcing paragraph 7 of GA-28 against Bombshells;
>
> (b) Going beyond permit revocation and closing or attempting to close Bombshells under color of GA-28; and
>
> (c) Preventing Bombshells from operating as a restaurant subject to the occupancy restrictions of paragraph 6.

80.     Plaintiff is entitled to injunctive relief because it has (1) a substantial likelihood of success on the merits; (2) the state's conduct presents a substantial threat that it will suffer irreparable injury absent the injunction; (3) this threatened injury outweighs any harm the injunction might cause the state; and (4) the injunction will not impair the public interest.

81.     Plaintiff has a strong likelihood of success on the merits. Plaintiff has a constitutionally protected property and liberty interests as set forth above. The risk of erroneous deprivation of such interests in violation of Plaintiff's due process rights is certain to continue so long as coronavirus remains part of our collective experience. There is a strong interest in protecting Plaintiff from further deprivations of its constitutional rights because the TABC's conduct, if not abated, will cause Plaintiff loss of use of its property and ongoing financial hardship, up to and including going out of business.

82.     Absent an injunction, Plaintiff will suffer irreparable injury. Even in the time of pandemic, businesses have a right to transact lawful business without fear of being shut down without warning or in derogation of equal protection of laws. The loss of constitutional freedoms for "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Particularly in the context of a pre-deprivation due process violation, "no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin,* 407 U.S. 67, 81 (1972); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process"). Monetary relief is insufficient as a matter of law.

83.     An injunction will not significantly burden any of the Defendants' interests, but will instead serve and enhance the public's interests. Nothing in the requested injunction inhibits the TABC's legitimate regulatory enforcement functions vis-à-vis the Texas Alcoholic Beverage Code and related laws. Indeed, the public interest favors the issuance of injunctive relief to protect the constitutional rights at stake in this case and to ensure that the TABC does not exercise such unbridled authority without affording citizens due process of law in the course of enforcing the Governor's executive orders.

### REQUEST FOR EXPEDITED HEARING ON PRELIMINARY INJUNCTION

84.     Pursuant to Federal Rules of Civil Procedure 6(c) and 65(a)(2), Plaintiff has notified Defendants of the filing of this lawsuit, provided them copy, and notified them that Plaintiff seeks a preliminary injunction hearing on or before July 30, 2020.

### REQUEST FOR EXPEDITED DISCOVERY

85.     Pursuant to Federal Rule of Civil Procedure 65(d), Plaintiff asks the Court to authorize expedited discovery in advance of any scheduled preliminary injunction hearing.

### ATTORNEYS' FEES

86.     Plaintiff requests payment of its reasonable attorneys' fees and costs. Plaintiff is entitled to recover reasonable and necessary attorneys' fees and expert fees. 42 U.S.C. § 1988.

## PRAYER

WHEREFORE, Plaintiff BMB Dining Services (Fuqua), Inc. d/b/a Bombshells Houston-South, respectfully requests that judgment be entered in its favor and that it be awarded the following forms of relief:

a.    Injunctive and declaratory relief, or, in the alternative, monetary relief

b.    Attorneys' fees;

c.    Expert fees;

d.    Costs of suit; and

e.    All other relief, in law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

Wallace & Allen, LLP

*/s/ Casey T. Wallace*
Casey T. Wallace
State Bar No. 00795827
SDTX Bar ID: 20117
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
cwallace@wallaceallen.com
**ATTORNEY-IN-CHARGE**
**FOR PLAINTIFF**

**OF COUNSEL FOR PLAINTIFF**
Benjamin W. Allen
State Bar No. 24069288
SDTX Bar ID: 1058996
William X. King
State Bar No. 24072496
SDTX Bar ID: 1674134
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
ballen@wallaceallen.com
wking@wallaceallen.com